**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:21-cr-00259-TSC** |
| | : | |
| **MARK K. PONDER,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Mark K. Ponder to sixty months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

I.     **INTRODUCTION**

The defendant, Mark K. Ponder, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1] Ponder assaulted three different law enforcement officers with poles on January 6.

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Ponder, a Washington, D.C. resident, assaulted police officers in the Capitol's West Plaza after rioters broke through the police line. He swung a pole at an officer and, after his pole broke against the officer's shield, he re-armed himself with a sturdier pole, then committed another assault on a different officer. About fifteen minutes later, in the Capitol's Upper West Terrace, Ponder assaulted another officer with that same, sturdier pole. He was taken down and detained by police officers who attempted to arrest him but was released after the officers were unable to get a transport vehicle to the Capitol grounds. Told to leave the Capitol, Ponder instead traveled to the Lower West Terrace so that he could again join the mob confronting officers at the mouth of the tunnel.

The government recommends that the Court sentence Ponder to 60 months of incarceration, which is within the advisory Guidelines' range of 57 to 71 months, which the government submits is the correct Guidelines calculation. A 60-month sentence reflects the gravity of Ponder's conduct but also acknowledges his acceptance of responsibility.[2]

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters – Ponder among them – descended upon the U.S. Capitol building and grounds in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured police officers, some with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety or sheltered inside their offices and even in the House Chamber; and

---

[2] The government agreed to limit its allocution to the bottom quarter of the Guidelines. Given the calculations set forth by the PSR, the bottom quarter would be anywhere between 57 and 60 months of incarceration.

they ransacked a historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Ponder's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials. The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to

keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were suspended. They resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

At approximately 12:45 p.m., a crowd began to gather against the barricaded fencing on the outer perimeter of the Capitol Grounds near the Peace Monument, which led to the Pennsylvania Walkway. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier., labeled as "1st Police Barricade" on Exhibit 1, and also circled in red as "Area A." By 12:58 p.m., the crowd, which already numbered in the hundreds, had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned

police barrier, "Area B." They then flooded the area labeled "Lower West Plaza," "Area C," pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

The crowd continued to grow and, at 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began loudly broadcasting a dispersal order to the crowd. The dispersal order was clearly audible over the roar of the crowd.

Despite the audible warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles. Defendant Ponder was first captured on video on the West Front at approximately 2:08 p.m., yelling at officers and using aggressive body language as he confronted officers manning the bicycle rack barrier and attempting to keep the crowd at bay.

After having actively defended the police line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed

up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters which began entering the building around 2:13 p.m. to build to a torrent.





*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court and others concurred. *See United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral

9

system.") (Judge Chutkan); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan); *see also United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (describing the riot as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself") (Judge Moss); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.      Defendant's Role in the January 6, 2021 Attack on the Capitol[3]

### *Ponder's First and Second Assaults on Police*

Defendant Ponder was among the rioters who seized the West Plaza from police officers at 2:28 p.m. He is first captured on video at approximately 2:08 p.m. as part of the crowd confronting police officers who were guarding the bicycle rack barricade line. Ponder is seen on video several times between 2:08 and 2:16 p.m. as he remains close to the front of the crowd immediately opposite of the barricade. At 2:31 p.m., Ponder is again captured on video in the

---

[3] In conjunction with this sentencing memorandum the United States will submit three video exhibits (Government Exhibit 1, 2, and 3) depicting the three assaults carried out by defendant Ponder, as well as the defendant's post-arrest exhortation to other rioters to "Hold the line."

crowd of rioters who occupied a raised platform on the West Plaza. That platform was behind the police line that broke at 2:28 p.m. and was directly in front of the staircase by which officers retreated from the West Plaza to the Lower West Terrace.

While on that raised platform, Ponder charged at U.S. Capitol Police Sergeant A.G. with a long, thin pole. He waved that pole aggressively and then attacked Sgt. A.G. by swinging the pole at him. A.G. defended himself by raising a round, clear riot shield in front of his face. Ponder struck the riot shield with such force that the pole snapped and broke apart as it made contact with the shield, and the top portion of the pole flew off to the side. Ponder then retreated back into the crowd. The screenshot below captures this assault.



*Figure 5: Ponder's first assault against a capitol police officer. His pole shattered as it hit the shield.*

Moments later, Ponder emerged from the crowd again, this time holding a thicker, sturdier pole which was colored in red, white, and blue stripes. Ponder ran towards a group of officers and

struck at them with this pole, repeatedly hitting a police shield as the officer holding the shield attempted to protect himself from Ponder's blows.



*Figure 6: Ponder's second assault against Capitol police. Here, he charged at a police officer with this new, sturdier pole.*

### Ponder's Third Assault

At 2:48 p.m., about fifteen minutes after these first two assaults, Ponder was in the Upper West Terrace, which is directly above the Lower West Terrace and accessible by an exterior staircase. On the Upper West Terrace, Ponder was part of a group of rioters who confronted police officers as they tried to clear the area. While other rioters yelled at the officers, Ponder banged his striped pole on the ground. He can be seen, before the confrontation, in the images below:



*Figure 7: Ponder in the Upper West Terrace, carrying the striped pole seen in Figure 6.*



*Figure 8: Ponder has removed his jacket in apparent anticipation of a fight.*

At 2:49 p.m., the line of police officers advanced toward the crowd and deployed Oleoresin

Capsicum (OC) spray in an attempt to disperse the crowd. Ponder swung his striped pole at officers

like a baseball bat, striking Metropolitan Police Department Officer J.C. in the left shoulder.

Ponder can be seen wielding the pole in the image below.



*Figure 9: Ponder wielding the pole like a baseball bat.*

Officer J.C., along with several other officers, tackled Ponder to the ground to arrest him.

### *Ponder was Taken into Custody, Released, and Then Returned to the Capitol*

After officers restrained Ponder, two officers—including Officer J.C., who Ponder struck while in the Upper West Terrace—walked Ponder around the southern side of the Capitol building, away from the crowds. Ponder encouraged his fellow rioters as he walked past them, shouting "Hold the line!" and "Do not give up!" To the officers, he was less respectful. He refused to provide his name or date of birth, even after an officer searched him and found his wallet with his ID card. While standing with the officers, he lectured them, saying:

> You know, deep in your heart, you know…that your fathers, your grandfathers, they fought for this freedom in which people are giving away. The thing is, at some point you are going to have to choose and make up your mind what side you are going to take…that's what we fighting for because they are stealing that right…and its blatant, everybody can see it.

He continued to rally his fellow rioters , saying "I will say this. When our country is being attacked

with, like we are, we have a right to fight…that is what the Second Amendment was built on."

Eventually, the officers learned that a transport vehicle would not be arriving for Ponder because of the chaos of the day, and that they were needed for crowd control. They released Ponder with instructions to leave the Capitol grounds and not return.

Nevertheless, Ponder ignored the instructions not to return to the Capitol grounds. Not only did he return, but he found his way into the densest crowd, where some of the worst fighting was taking place: the Lower West Terrace, at the mouth of the tunnel. By approximately 4:07 p.m., the tunnel's surveillance camera captured Ponder at the mouth of the tunnel, holding a riot shield. In that video, he appeared to be trying to maintain control of the shield and hold it between himself and the police line, either to block police as they fought back against the crowd, or to use the shield to push into police. The images below show Ponder with the riot shield. At approximately 4:10 p.m., an officer standing in the tunnel, in an elevated position, deployed a chemical spray at members of the crowd, including Ponder. It appears that the chemical spray struck Ponder's face, causing him to retreat.



*Figure 10: Ponder works with other rioters to pass a police riot shield forward.*



*Figure 11: Ponder grips the riot shield and turns it toward the police line.*



*Figure 12: Ponder's face is visible under the riot shield.*



*Figure 13: Ponder places the shield between himself and police.*

Despite his retreat from the tunnel after being struck with a chemical spray, defendant Ponder still did not leave the Capitol Grounds. Approximately an hour later, shortly after 5:00 p.m., Ponder was spotted once again on the Lower West Terrace and his presence is captured on the Body Worn Camera video of an officer on scene. As officers began to reclaim the terrace, Ponder was pushed along with the rest of the crowd away from the Lower West Terrace and eventually off of Capitol Grounds. In all, video captured defendant Ponder on Capitol Grounds between 2:08 p.m. and 5:00 p.m. (even after being detained for a portion of that time and told to leave), spending most of that time in locations that had some of the most active opposition to police.

### *Ponder's Arrest and Interview*

Following his arrest on March 17, 2021, Ponder participated in a videotaped interview with the FBI. Ponder admitted to marching with a crowd toward the Capitol Building on January 6, 2021, initially being stopped by officers who would not permit the crowd to go beyond a barricade to the Capitol. Ponder admitted to striking at least one officer on the Capitol grounds while he swung a red, white, and blue pole. He claimed he could not remember whether he had struck more than one officer. He described how "emotions were high" the day of the riot and how he believed "the election was stolen." He described feeling that "stuff had been piling up for so long" that, eventually "at some point it just broke."

Although Ponder insisted that his assaults on the officers that day were not "personal" because he generally "stands with" officers, he faulted the officers for their failure to join ranks with the rioters. In his words,

> I know that I had an incident with them, but I'm trying to get the police to understand, I'm for you. At some point in time, the way this country is going, you

> gonna have to pick a side, where you stand at. I'm an American and I'm proud of that. And the way things are going right now, with the stuff that is going on in the street everyday; business are closing up; people are out here fighting for their livelihoods…that day, when I got into it with them, I was angry because I felt as though he [the police] …was out here being a part of that problem. The police were being a part of the problem.

When asked about his "standoff" with officers on the Capitol grounds, Ponder described how he was unwilling to back down, saying:

> With that incident, at that point in time a lot led up before that incident; a lot of things had happened. At that point in time with that standoff with him, it was like I'm already in the fight now. I'm already in the fight, you know. And so, let's get this straight, it was nothing personal against him or against the police period. But, at that point in time I'm in the fight you understand. And, I've come this far, I can't quit now. Like I said, I'm an American, I come this far I can't quit now.

Nevertheless, he did express regret for assaulting an officer, offering both an apology and expressing concern that the officer may have been hurt.

Ponder claimed that he was frustrated that neither the court system nor law enforcement officials had stepped in to ensure that there had been an investigation into the election. He indicated that his actions at the Capitol were in response to what he perceived as the American people being "robbed."

> If we going to get down into the election, okay, that's part of it. Okay. Cause the election, I know I shouldn't say it, but I really feel as though it was stolen. And now, being like you, we Americans here and as Americans we can lose, that's okay. If we put forth our best, and we fight, we lose, okay. But you cannot stand if someone is going to take it from you. If you are going to get robbed. And you go to work everyday and you go outside and somebody robs you. That's something you can't take, right?...And that's how I feel about this election. The evidence of…the thing about it is, our Supreme Court, we have a Supreme Court here that is supposed to stand for stuff like this. And say okay. Why hasn't the Supreme Court stepped in? Why didn't Barr step in, at the very least, at the minimum to say 'let's have an investigation.' The allegations, there are too many allegations, there is too much going on for us to say something is not happening…why not at least at the minimum have an investigation to look into it?

Throughout the interview, Ponder presented his point of view as thought his conduct—including the violence he acknowledge committing—was justified by his grievances.

### III.     THE CHARGES AND PLEA AGREEMENT

Ponder was arrested on March 17, 2021. On March 26, 2021, a federal grand jury returned an indictment charging Ponder with the following offenses: three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); three counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). On November 10, 2021, a federal grand jury returned a superseding indictment charging Ponder with these same offenses.[4] On April 22, 2022, Ponder pled guilty to Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). In the plea agreement, he

---

[4] The Superseding Indictment modified the charges brought under 18 U.S.C. §§ 231(a)(3) and 1512(c)(2) to allege an affect on interstate commerce. It further modified the charges brought under 18 U.S.C. § 1752(a) to remove references to a visit by the Vice President-elect.

agreed to pay $2,000 in restitution for the monetary harms caused by the riot to which he had so actively contributed.

## IV.     STATUTORY PENALTIES

Ponder now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) and (b). As noted by the plea agreement and the U.S. Probation Office, Ponder faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees that the U.S. Probation Office has correctly calculated Ponder's offense level and criminal history. PSR ¶¶ 36-57. Accordingly, based on the government's calculation of Ponder's total adjusted offense level, after acceptance of responsibility, Ponder's Guidelines imprisonment range is 57 to 71 months' imprisonment. The plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. The

government also agreed, pursuant to the plea agreement, to cap its allocution at the bottom quarter of the guidelines, as determined by the Court.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol grounds and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the

timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Ponder's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Ponder's crimes weigh heavily towards a significant term of incarceration. Ponder committed violence on multiple occasions while using weapons, encouraged others to resist police, ignored police commands to leave the grounds, and put himself in the thick of some of the worst fighting at the Capitol. Even after police ordered him to leave the Capitol Grounds, he returned and remained engaged with the crowd for at least an additional hour. Approximately two months later, after he was arrested, he claimed to feel badly and expressed regret for hurting an officer—but also expressed a feeling of being justified in his conduct. The seriousness of Ponder's conduct demands a lengthy sentence of imprisonment.

**B.  Ponder's History and Characteristics**

Ponder has a long history of arrests and convictions, including for crimes of violence. Most significantly, in 2008, following a guilty plea, Ponder was convicted in this court of bank robbery and robbery. Case no. 1:07-cr-00236-RWR. Ponder pleaded guilty to two separate robberies in the District of Columbia committed a week apart. On July 9, 2007, Ponder entered a PNC Bank on Columbia Avenue, Northwest, handed the teller a note demanding money, and left with currency totaling $2,469. PSR ¶ 56. A week later, on July 15, 2007, Ponder robbed a taxi driver of his vehicle after forcing the driver and passenger out of the vehicle. As he attempted to get away, he drove into a second vehicle and then reversed, driving the stolen taxi backwards and up onto a police cruiser. *Id.* Ponder was sentenced to a total of 36 months imprisonment for each robbery, to be served concurrently, and 36 months of supervised release. *Id.* Because these offenses were included in the same charging instrument and the sentences for both were "treated as a single sentence," they result in four criminal history points in this case. U.S.S.G. § 4A1.1(a), (e).

Ponder also has several convictions which do not "count" for Guidelines purposes because of their age but demonstrate Ponder's long history of violent and dangerous conduct. These convictions, all from the District of Columbia's Superior Court, include: a 2003 misdemeanor domestic assault in case no. 2003-DVM-3614, a 1991 misdemeanor conviction for attempted possession of cocaine in case no. 1991-CMD-5109, a 1991 misdemeanor conviction for attempted possession with intent to distribute cocaine in case no. 1990-FEL-7751, a 1985 felony conviction for attempted burglary in 1984-FEL-6175, and a 1985 conviction for carrying a dangerous weapon (felony) in 1984-FEL-1047.

The government acknowledges that Ponder's criminality appears to stem, at least in part, from an extraordinarily difficult childhood, combined with periods of addiction and mental health struggles.  *See* PSR ¶¶ 64-69, 77-83.   The confluence of these factors has led Ponder to spend significant periods of his adult life incarcerated and under court supervision.

In sum, even before he set foot on Capitol grounds on January 6, 2021, Ponder had a significant criminal history that spanned three decades, included multiple felonies, and included multiple instances of violent conduct. Ponder's history of violence is especially concerning in light of his statements about choosing to fight with police officers at the Capitol. This history demonstrates that Ponder poses an ongoing risk of violence to others, including but not limited to political violence, and this factor weighs heavily in favor of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Ponder's criminal conduct—arming himself during a riot, assaulting a police officer, re-arming himself after his first weapon broke, assaulting two additional police officers, encouraging the crowd to attack the police, and returning to the Capitol after express instructions to leave—demonstrates a profound disrespect for the law generally, and

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

for the democratic process specifically. The rule of law was under attack during a protracted siege that Ponder knowingly joined. Again, and again, he made the decision to clash with police officers. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

don't think that any plausible argument can be made defending what happened in the Capitol on

January 6th as the exercise of First Amendment rights."). And it is important to convey to future

rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

weighs heavily in favor of a lengthy term of incarceration. Ponder's history of arrests and

convictions shows a clear pattern of assaultive behavior. And his statements to the FBI confirm

that, even after the riot, he saw his conduct as justified. According to him, a violent response was

justified because Americans were being "robbed." He even seemed to suggest that he tried to

persuade police to join the mob. And, after being disarmed and brought down, he found his way

to a different part of the capitol where some of the worst violence was taking place and

enthusiastically joined it. Ponder has demonstrated a willingness to use violence for political ends,

28

which suggests that his ongoing incarceration will help protect the community, and that a lengthy prison term is necessary to promote the goal of specific deterrence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Ponder and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

This case bears significant similarities to others in which defendants were convicted by guilty plea of assaulting police officers during the riot on January 6, 2021. *E.g.*, *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months of incarceration); *United States v. Mattice and Mault*, 1:21-cr-657 (BAH) (44 months of incarceration as to each defendant); *United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months' incarceration); *United States v. Creek*, 1:21-cr-645 (DLF) (27

months of incarceration); *United States v. Thompson* 1:21-cr-461 (RCL) (46 months of incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months of incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months of incarceration); *United States v. Miller*, 1:21- cr-75 (RDM) (33 months of incarceration); *United States v. Wilson*, 1:21-cr-345 (RCL) (51 months of incarceration).

In particular, the defendant's conduct here is similar to the conduct in *Palmer*, where this Court imposed a 63-month sentence, as requested by the government, where the defendant participated in the violence on the Lower West Terrace. There, Palmer attacked officers by throwing a wooden plank at officers, spraying the contents of a fire extinguisher and then throwing the empty canister at officers, throwing a fire extinguisher a second time, and later throwing a large pole at officers. It is also similar to *Wilson*, where the court imposed a sentence of 51 months of incarceration where the defendant actively engaged in the violence taking place on the Lower West Terrace.  In that case, before Judge Lamberth, defendant Wilson is alleged to have participated in the crowd that was punching, shoving, and kicking officers guarding the entrance inside of the tunnel.  He then picked up an object, believed to be a PVC pipe, and used it to indiscriminately strike at the officers, hitting at least one officer before throwing it into the crowd and striking another officer.

Here, Ponder engaged in violence on the Capitol Grounds, including by assaulting multiple police officers. He also armed himself with a weapon, increasing the level of violence brought to bear against officers who were overrun and outnumbered.  His background also includes prior crimes of violence that distinguish him from many of the other January 6 defendants. A sentence

of 60 months, here, will not create an unwarranted sentencing disparity and would be consistent with other similarly-situated defendants.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as

32

a result of" the offense of conviction. *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See United States v. Emor*, 850 F. Supp. 2d 176, 202 (D.D.C. 2012). The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); see United States v. Sheffield, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title

49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Applying these principles to this case leads to the conclusion that Ponder should be required to pay at least $2,000 in restitution. Although Ponder's conviction under 18 U.S.C. §§ 111(a)(1) and (b) is a crime of violence under the MVRA, *see* 18 U.S.C. § 3663A(c)(1)(A)(i), the government has not identified any injuries or harm to officers that resulted from the conduct underlying that conviction.[7] The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ponder must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Ponder played in the riot on January 6.[8] Ponder's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

---

[7] If the United States learns of specific financial losses associated with any of the officers assaulted by defendant Ponder on January 6, 2021, the United States may filed a supplemental request for restitution.  18 U.S.C. § 3664(a)(5).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 60 months, which is in the bottom quarter of the Guidelines range, three years of supervised release, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:      */s/ Michael J. Romano*
MICHAEL J. ROMANO
Trial Attorney / Detailee
Bar No. IL 6293658
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-6691
michael.romano@usdoj.gov

JOCELYN BOND
Assistant United States Attorney
D.C. Bar Number 1008904
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 809-0793
Jocelyn.Bond@usdoj.gov