UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .  CR No. 21-0259 (TSC)
                                .
     v.                         .
                                .
MARK K. PONDER,                 .  Washington, D.C.
                                .  Tuesday, July 26, 2022
          Defendant.            .  11:39 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:              JOCELYN P. BOND, AUSA
                                 U.S. Attorney's Office
                                 601 D Street NW
                                 Washington, DC 20530
                                 (202) 252-7566

                                 MICHAEL J. ROMANO, ESQ.
                                 U.S. Department of Justice
                                 1331 F Street NW
                                 Washington, DC 20004
                                 (202) 307-6691

For Defendant:                   JOSEPH R. CONTE, ESQ.
                                 Law Offices of J.R. Conte
                                 400 Seventh Street NW
                                 Suite 206
                                 Washington, DC 22039
                                 202-236-1147

Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue NW
                                 Washington, DC 20001
                                 (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have criminal action 21-259, United States of America versus Mark Ponder.  We have Ms. Jocelyn Bond and Mr. Michael Romano representing the government, Mr. Joseph Conte representing Mr. Ponder, all in person, and we also have Mr. Robert Walters representing Probation.  He is here in person as well.

THE COURT:  Actually, Counsel, can you pick up the intercom phone.  I just want to have a bench conference with you -- we don't have it yet?  Can you just step into the jury room for a minute?

(Court and Counsel exit, return.)

THE COURT:  Just for the record, we have a victim who wishes to address the Court today, as is his right, and I just wanted to know if the victim wanted to be identified by his initials or not.  But we've cleared that up.  So that's what that conference was about.

Okay.  We're here for the sentencing of Mr. Mark K. Ponder, who has pleaded guilty to Count 1 in the superseding indictment charging him with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b).

Mr. Ponder, can you hear me?

THE DEFENDANT:  Yes.

THE COURT:  Are you feeling fit and ready to proceed

1    with this sentencing?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Your mind clear?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Okay.  I'm going to ask that -- you may

6    remain seated at counsel table if I have any questions for

7    you, but I am going to ask that you lean into the microphone,

8    keep your mask on, and speak into the microphone if I need you

9    to answer any questions.

10       Similarly, counsel, Mr. Romano, Ms. Bond, Mr. Conte, it's

11   totally up to you.  You can stay at counsel table, just make

12   sure you speak into the microphone.  You don't have to stand.

13   Or you can approach the podium.  And if you need to take your

14   mask off while you're speaking at the podium, that's fine,

15   just as long as you keep it on when you're not speaking.

16       All right.  Now, in preparation for this sentencing I have

17   reviewed -- I've received and reviewed the following

18   documents:  The presentence report and the sentencing

19   recommendation from the probation office.  And I've also

20   received the following documents submitted by counsel in

21   advance of the hearing:  The plea agreement and statement of

22   offense that were signed by Mr. Ponder as well as counsel,

23   sentencing memoranda from the government including three video

24   exhibits which I viewed.  Have those video exhibits been filed

25   on the docket?

1          MS. BOND:  They have not, Your Honor.

2          THE COURT:  Is the government going to move for them to

3      be filed on the docket?

4          MS. BOND:  Yes.

5          THE COURT:  Mr. Conte, do you have an objection to

6      those exhibits being filed on the public docket given that I

7      have considered them in sentencing?

8          MR. CONTE:  No, Your Honor.

9          THE COURT:  The motion is granted.  The video exhibits

10     will be filed on the docket.

11        So as I've said, sentencing memoranda from both the

12     government and Mr. Conte, and a request for a variance

13     downward from Mr. Conte on Mr. Ponder's behalf.  And I have

14     received a victim impact statement from one of the officers

15     whom Mr. Ponder assaulted.  That statement has been filed

16     under seal and a redacted version I believe is or will be --

17     will that be filed on the public docket?

18          LAW CLERK:  It's filed under seal.

19          THE COURT:  It's filed under seal.  Ms. Bond, can you

20     file a redacted version on the public docket?  Is that

21     possible?

22          MS. BOND:  Yes, Your Honor.

23          THE COURT:  Thank you.

24        Let me first begin with the presentence report.  The final

25     presentence report and sentencing recommendation were filed on

1      July 14, 2022.  Ms. Bond, Mr. Romano, does the government have

2      any objection to any of the factual determinations set forth

3      in the report?

4            MS. BOND:  No, Your Honor.

5            THE COURT:  I understand you have at least one victim

6      who will be speaking.  Do you expect there to be any other

7      evidence proffered?

8            MS. BOND:  No.

9            THE COURT:  All right.  And I received the letter from

10     the police officer.

11        Mr. Ponder, are you fully satisfied with the services of

12     your lawyer, Mr. Conte, in this case?

13            THE DEFENDANT:  Yes.

14            THE COURT:  All right.  Do you feel you've had enough

15     time to talk to him about the probation department's

16     presentence report and all the papers that have been filed by

17     the government in connection with the sentencing?

18            THE DEFENDANT:  Yes.

19            THE COURT:  All right.  Mr. Conte, have you and

20     Mr. Ponder read and discussed the presentence report?

21            MR. CONTE:  Yes, Your Honor.

22            THE COURT:  Are there any disputed issues of fact; that

23     is, does Mr. Ponder have any objection to any of the factual

24     statements set forth in the presentence report?

25            MR. CONTE:  No, Your Honor.

THE COURT:  All right.  Hearing no objection, I will accept the factual recitation in the presentence report regarding the circumstances of this offense, and therefore the facts as stated in the presentence report will be my findings of fact for the purpose of this sentencing.

All right.  With regard to the sentencing guidelines, the presentence report lays out the probation office's calculation of the advisory guideline range that applies in this case, and this calculation was done using the 2021 guidelines manual and is as follows:

The guideline for 18 U.S.C. § 111(a)(1) offenses is U.S. sentencing guideline §2A2.2.  That section provides that an offense involving aggravated assault has a base offense level of 14.  Because a dangerous weapon was used, and that is on at least two occasions the defendant swung a pole at law enforcement, which in one incident resulted in contact, the offense level is increased by four.

The defendant was convicted under 18 U.S.C. § 111(b); therefore, the offense level is increased by two.  And pursuant to U.S. sentencing guideline §2A2.2, comment note 4, because U.S. sentencing guideline §3A1.2(a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A, six levels are added.

The defendant has demonstrated acceptance of responsibility for the offense.  Accordingly, the offense level is decreased

1    by two levels.  And the defendant has also assisted

2    authorities in the investigation or prosecution of the

3    defendant's own misconduct by timely notifying authorities of

4    the intention to enter a plea of guilty.  Accordingly, the

5    offense level is decreased by one additional level.  This

6    results, by the probation office's calculation, with which I

7    agree, in a total offense level of 23.

8        Ms. Bond, Mr. Romano, is there any disagreement with that

9    calculation?

10            MS. BOND:  No, Your Honor.

11            THE COURT:  Mr. Conte?

12            MR. CONTE:  No, Your Honor.

13            THE COURT:  And I believe -- let me double-check.  That

14   was the calculation that the parties estimated in the plea

15   agreement, which obviously isn't binding on me.  But just for

16   the record, that comports with the parties' pre-plea

17   calculation.

18        All right.  With regard to the criminal history category,

19   the presentence investigation report has found that Mr. Ponder

20   has a criminal history score of 4.  According to the

21   sentencing table in U.S. sentencing guideline Chapter Five,

22   Part A, a criminal history score of 4 establishes a criminal

23   history category of Roman numeral III.

24        Any disagreement with that calculation, Ms. Bond?

25            MS. BOND:  No.

1      THE COURT:  Just checking.  That's the estimate in the

2 plea agreement.  Mr. Conte?

3      MR. CONTE:  Correct, Your Honor.

4      THE COURT:  Okay.  Based on the offense level and

5 criminal history category I've just discussed, the presentence

6 report calculates the guidelines sentencing range to be 57 to

7 71 months of imprisonment, which is also -- I also agree with

8 that calculation, and I would note that that is the

9 calculation that the parties estimated in the plea agreement.

10      Any objection to that calculation, Ms. Bond and Mr. Romano?

11      MS. BOND:  No, Your Honor.

12      THE COURT:  Mr. Conte.

13      MR. CONTE:  No, Your Honor.

14      THE COURT:  Okay.  All right.  Having determined the

15 applicable guidelines range, the next step is for me to

16 consider departures and variances.  The presentence report

17 does not include any grounds for departure and the parties do

18 not make any arguments regarding departure.  Is that correct,

19 Ms. Bond?

20      MS. BOND:  Correct.

21      THE COURT:  Mr. Conte.

22      MR. CONTE:  Correct.

23      THE COURT:  Now, in the sentencing memorandum,

24 Mr. Conte does argue for a downward variance from the

25 guidelines range, which I will address when I hear argument

1  from counsel.

2      All right.  Now, § 3553 requires me to consider a variety

3  of factors including the sentencing range the guidelines

4  prescribe, which I've just discussed, and also the applicable

5  penal statutes.  The charge of Assaulting, Resisting or

6  Impeding Certain Officers Using a Dangerous Weapon in

7  violation of 18 U.S.C. § 111(a)(1) and (b) is a Class C felony

8  that carries a maximum term of 20 years of imprisonment.

9      The statute provides that Mr. Ponder faces a supervised

10 release range following imprisonment of not more than three

11 years under 18 U.S.C. § 3583(b)(2).  Under the guidelines,

12 that range is one to three years.

13     The statute also provides that Mr. Ponder is eligible for

14 not less than one nor more than five years' probation because

15 the offense is a Class C felony.  But because the applicable

16 guideline range is in Zone B of the sentencing table, the

17 defendant is ineligible for probation.

18     The statute sets a maximum fine of up to $250,000.  The

19 guidelines range for this offense is from $20,000 to $200,000.

20 A special assessment of $100 is mandatory per felony count.

21 He's pleaded to one felony count.  And pursuant to 18 U.S.C.

22 § 3663a and the parties' plea agreement, Mr. Ponder will be

23 ordered to pay restitution in the amount of $2,000.

24     Counsel, have I stated accurately the statutory and

25 guidelines framework under which we're operating, Ms. Bond and

1    Mr. Romano?

2              MS. BOND:  Yes, Your Honor.

3              THE COURT:  Mr. Conte?

4              MR. CONTE:  Yes, Your Honor.

5              THE COURT:  Okay.  Now, in case the parties have not --

6    I allow parties to get this information, but just in case you

7    all have not received the probation office recommendation, I

8    will notify you of what that is.

9        Taking into account the guidelines range, the available

10   sentences, and all of the factors in § 3553(a), probation

11   office recommends 57 months of imprisonment, 36 months of

12   supervised release, and $2,000 in restitution.  The

13   recommendation of the probation office is not based on any

14   facts or circumstances that have not already been revealed to

15   the parties in the presentence report or in open court.

16       All right.  At this point I would like to give the parties

17   the opportunity to address the Court regarding both

18   Mr. Ponder's request for a variance and the appropriate

19   sentence in this case.  Who will be speaking for the

20   government?

21             MS. BOND:  I will, Your Honor.

22             THE COURT:  All right.

23             MS. BOND:  Before I begin, Your Honor, I do want to

24   ask, are there any specific questions Your Honor would like me

25   to address as part of our allocution?

1          THE COURT:  No.

2          MS. BOND:  Thank you.  So as we laid out in our

3     sentencing memorandum, we are requesting a sentence of 60

4     months of incarceration for Mr. Ponder in this case.  We

5     believe that this is a fair and just sentence that takes

6     account of all the 3553 factors.  It takes account of the

7     severity of Mr. Ponder's crime, the lasting damage that he did

8     to the victims in this case, particularly Sergeant Gonell, who

9     you will hear from later.

10          It takes account of Mr. Ponder's history and the violent

11     episodes that have punctuated the last four decades that we

12     see through his criminal history, and it also takes into

13     account the fact that he did ultimately accept responsibility

14     for his actions.

15          The first issue that the government believes supports or

16     the first factor we think supports our request for 60 months

17     is the severity of the crime.

18          There were three assaults against officers that Mr. Ponder

19     committed on January 6, and they were on the more violent end

20     of the spectrum of what people did on that day.  There was a

21     pretty wide range of conduct, from people who were simply

22     parading through the Capitol to people who did get very

23     violent with officers, and Mr. Ponder falls on that higher

24     end.

25          And it wasn't just one assault.  We have three assaults

1    that spanned a good deal of time.  They also involved weapons.

2    As Your Honor saw in our sentencing memorandum, there was a

3    pole that he used during the first assault against Sergeant

4    Gonell.  That broke.  And then he rearmed himself for the

5    second and third assault, with a bigger, sturdier pole.

6         THE COURT:  That's the red, white, and blue pole?

7         MS. BOND:  It was.  And there's some perversity to the

8    fact that it was a red, white, and blue pole and the imagery

9    that that generates as if assaulting law enforcement officers

10   who are there doing their job could somehow be patriotic.

11       And one thing that I hope that the Court saw in viewing the

12   videos of these assaults, as distinct from what you see in the

13   photographs, is the rage and aggression that really comes

14   through as he's committing these assaults.

15       These weren't halfhearted.  This is Mr. Ponder physically

16   enraged, going at these officers, all three of them.  And I

17   think that's an important fact to take into account in

18   choosing a sentence here.

19       As you will hear from Sergeant Gonell and as he included in

20   his victim impact statement, when that pole hit his shield and

21   broke Mr. Ponder's stick, it actually put a crack in Sergeant

22   Gonell's shield.  So I think the severity of the crime really

23   supports our request for 60 months here.

24       The second factor we think that really supports this

25   request is Mr. Ponder really kept going.  This was not a

one-off.  The fact that we've got one and then a second one
right following after the first assault, and then a full 15
minutes later, he's in a different location on a different
terrace going after a third officer.

And what is particularly distinct about Mr. Ponder is even
after those first three assaults, he had a big opportunity to
stop, to back off, to leave the Capitol, because Mr. Ponder is
tackled after that third assault.  He's put in handcuffs and
spends a full 20 minutes, if not more, with those two officers
who are planning on placing him under arrest.  But transport
couldn't get there because of the chaos.  There was no police
transport coming.  So the officers ordered him off the
grounds, sent him away, thought he was leaving.

But what we see is, at four o'clock, Mr. Ponder is back on
video in the thick of the fighting.  He's seen at the entrance
to the Lower West Terrace tunnel where a mob battled for
hours.  So Mr. Ponder wasn't there for that number of hours,
but he shows back up at four o'clock.

An hour later he's spotted again, Lower West Terrace as the
officers are finally able to --

THE COURT:  Is this the 5:08 p.m. sighting?

MS. BOND:  Yes.  He's still there as they're clearing
it off.  So the fact that Mr. Ponder just kept going, even
when he has this really big opportunity to choose a different
course, he does not back off.  And we think that that supports

1     our 60-month request.

2          The third factor that we also believe supports the request

3     for 60 months is Mr. Ponder's criminal history, which is in

4     contrast to many other similarly situated rioters.  Mr. Ponder

5     does have convictions dating back to 1982.  And of course,

6     it's only the most recent ones, the 2008 robbery and bank

7     robbery convictions that count for criminal history purposes,

8     but the fact that he has domestic violence, weapons

9     possession, drug possession, those are all very big concerns,

10    and they seem to be rearing their head every decade.  So

11    Mr. Ponder's lengthy criminal history is something that

12    supports that 60-month sentence.

13         We also think that the fact that this is an in-guidelines

14    sentence supports our request.  It is at the lower end of the

15    guidelines, and I would note that probation of course did

16    recommend 57 months, which is just shy of what the government

17    is requesting here.

18         Finally --

19         THE COURT:  Excuse me, Ms. Bond.  I recall from the

20    plea agreement the government agreed to allocute for the

21    bottom quarter of the guideline range.

22         MS. BOND:  Yes, Your Honor.

23         THE COURT:  And 60 months is at the top of that

24    quarter.  Is that correct?

25         MS. BOND:  Yes.  And I apologize.  When we entered into

1    the plea agreement, there was an understanding that the

2    request would be within that range.

3        And the final factor that we believe supports our request

4    is that a 60-month sentence would be consistent with what

5    other rioters who have engaged in assaults against law

6    enforcement -- what we have requested.  And we laid out

7    several different cases that we think have similarities to

8    what Mr. Ponder did.

9        So for all those reasons, we are requesting 60 months here,

10    Your Honor.  And would Your Honor like to hear from Sergeant

11    Gonell now or wait until a later time?

12            THE COURT:  I think I'd like to hear from Sergeant

13    Gonell now.  You may step up, sir.  Good morning.

14            SERGEANT GONELL:  Good morning, Your Honor.

15            THE COURT:  Could you state your name for the record if

16    you're comfortable doing that.  Or you can state your

17    initials.

18            SERGEANT GONELL:  My name's Aquilino Antonio Gonell,

19    member of the United States Capitol Police, and my position at

20    that time was sergeant.

21            THE COURT:  You're free to tell the Court whatever

22    information, whatever you would like me to know before I

23    consider -- before I impose sentence in this case.  And thank

24    you for coming today.

25            SERGEANT GONELL:  Thank you.  One thing that I just

1       wanted to clear up is that day we didn't have a parade.  There

2       was no parade at the Capitol.  There was no picketing.  It was

3       a riot.  That was happening as we were trying to protect the

4       procedure of transfer of power from one president to another.

5          When I encountered Mr. Ponder, I was fighting not just him

6       but other individuals.  And while I was distracted, fighting,

7       engaging the other individuals, he came from my -- on my right

8       side.  Luckily, I saw him as he approached me through the

9       corner of my eyes.  I was able to raise my shield up using my

10      left hand.  The impact of his blow to my shield cracked it.

11      It was powerful.  I have no doubt in my mind that had I not

12      had my shield and my helmet, it would have severely

13      incapacitate me at that time.

14         He retrieve it, pick up another weapon, because the hit he

15      did on my shield, it shatter his initial weapon.  As I

16      continued to retreat and pull in all my other officers as

17      well, I was stepping on people's blood, blood that was already

18      on the ground from them, from the officers and from myself.

19      And they didn't have no regard.  He didn't have no regard for

20      my life or the other officers.  Because we were in full

21      uniform that day, in riot uniform.  There was no mistake in

22      him understanding that he was assaulting a police officer.  I

23      was not in civilian clothes.  I was not in incognito or -- you

24      know, one of them.  I was in full police uniform and he

25      attacked me and the other officer.

1     A second time I came in contact with him at the entrance,

2  in the Lower West Terrace entrance, that was where -- well,

3  about half an hour later, after he initially struck me.  And

4  there too he had the opportunity to leave.  He had the

5  opportunity.  And he didn't do that until he got

6  pepper-sprayed by my coworkers.  There's no doubt that this

7  person had the will and the intent to continue doing harm

8  during that day.

9     It was horrific, it was chaos.  That particular day

10  impacted me for the rest of my life.  I'm not putting all the

11  blame on him, but he was part of it.  He impeded me from

12  restoring order at the Capitol.  He impeded me from coming to

13  the aid of my fellow officers.  He impeded them from coming to

14  my aid.  So it was -- everything that he did had consequences.

15  The consequences of his action had led me to have an early

16  retirement.  Something that I done for 16 years, I can no

17  longer do it because of what he done.

18     My family have suffered emotionally, financially, and

19  physically.  There are a lot of things I cannot do anymore

20  because of that day.  And he contributed.  He may not have

21  done it, but he had contributed to those things, my injuries,

22  mentally and physically as well.  I just want some type of

23  accountability.

24     And I get it, he's old.  But guess what:  When he was

25  attacking me, he was still old.  He knew who he was attacking.

1    He didn't care whether that was a police officer or not.  He

2    didn't care whether I have family.  He didn't care any of

3    those things that he's seeking leniency for.

4       So please do not fall for his plea, because that day he

5    didn't care about those things.  He didn't care about COVID,

6    he didn't care about being in public area.  That place was

7    restricted just for the members of Congress and the senators,

8    police officers, people who were in the building, authorized

9    people.

10      In order for him to get to me and to the entrance of the

11   tunnel, he had to go through multiple layers of security

12   including going through police officers and attacking those

13   officers, including myself.

14      So please don't fall for it, the leniency cry that he was

15   caught up.  I got caught up defending the Capitol.  That's

16   what I got caught up.  That's what I signed up for, and I kept

17   doing what I -- my job.  So whatever leniency plea or -- I got

18   caught up in the riot, in the moment, that's BS.  That's BS.

19   And please don't fall for that, because he has changed my

20   life, him and other people changed my life, not for the

21   better.

22      THE COURT:  Thank you.  Thank you, Sergeant Gonell.

23   While you're here, I want to thank you personally for your

24   service that day and your colleagues' service that day and the

25   sacrifices that you have made in helping to make sure that we

did have a transition of power on that day.  And I think I

speak on behalf of millions of citizens of this country who

thank you and appreciate the courage you showed that day.

SERGEANT GONELL:  Thank you, Your Honor.

THE COURT:  Mr. Conte?

MR. CONTE:  Thank you, Your Honor.  Your Honor, the

only thing I'd like to say about a variance is that the Court

needs to take into consideration his age.

THE COURT:  Well, and -- not that I'm going to do this

personally, but Sergeant Gonell just said "maybe he was old."

Mr. Ponder's younger than I am.  I ran some seven miles

yesterday.  But I hear your point with regard to his age.

And time served is harder the older you get, for sure.

MR. CONTE:  Yes, Your Honor.  He turns 57 next week.

So that and the fact that his sincere remorse at what he did

is the reason that we would ask the Court to take that into

consideration.

THE COURT:  Well, Mr. Conte, I hear you with regard

to the downward variance.  One of the things that I have to

consider is the sentence disparities.  And I take no pleasure

in the fact that one of the highest sentences that have been

handed down so far was by me in the *U.S. v. Palmer* case, which

the government cites as a comparable in its disparity

argument.  In that case I gave Mr. Palmer, who had a previous

conviction, who I believe was older than Mr. Ponder, and who

1    pleaded guilty to similar acts of violence against the police,

2    but those acts of violence did not result in the kind of

3    damage that Mr. Ponder's acts did.  And I gave him 63 months.

4    So why should this sentence differ from Mr. Palmer's sentence,

5    which I still believe is an appropriate sentence.

6         MR. CONTE:  I haven't seen Mr. Palmer's presentence

7    report, obviously, but the Court has read Mr. Ponder's

8    background.

9         THE COURT:  I agree he has mitigating circumstances in

10   terms of his upbringing.  Absolutely.

11        MR. CONTE:  And actually, they're as severe as any I've

12   seen in my career doing criminal law, the way he grew up and

13   the adversities he faced.

14        THE COURT:  I don't disagree with you.

15        MR. CONTE:  That's all I have to say.  I think those

16   are the reasons for the request, Your Honor.

17        THE COURT:  Thank you, Mr. Conte.

18        MR. CONTE:  You're welcome.

19        THE COURT:  Mr. Ponder?  I told you at your plea

20   agreement that you would have the right and the opportunity to

21   speak and address the Court and tell me anything you want me

22   to know about you or this crime or anything you feel I should

23   know before I impose sentence.  I also told you you didn't

24   have to speak, and that if you didn't I would not hold it

25   against you.  But if you did, I would hear what you had to say

1    and factor that into your sentence.  Do you wish to speak at
2    this time?
3              THE DEFENDANT:  Yes, I do, Your Honor.
4              THE COURT:  All right.  You can go ahead, sir.
5              THE DEFENDANT:  Okay.  First of all I'd like to say
6    that on that day, if I go back to the beginning, I didn't mean
7    for any of this to happen.  I went there with the intentions
8    on a peaceful protest.  However, things had spiralled out of
9    control.
10             THE COURT:  When you say that, Mr. Ponder, what?
11   What --
12             THE DEFENDANT:  Your Honor, I was there.  And I don't
13   know what happened, but all I know is chaos broke out.  Total
14   chaos.
15             THE COURT:  Did you march to the Capitol from the rally
16   on the Ellipse?
17             THE DEFENDANT:  Yes, I did.
18             THE COURT:  Okay.  When you got to the Capitol, did you
19   see what was going on?
20             THE DEFENDANT:  No.  Once I got to the Capitol, chaos
21   had broke out.
22             THE COURT:  All right.
23             THE DEFENDANT:  Total chaos.
24             THE COURT:  So you saw the chaos when you got there.
25   Right?

1          THE DEFENDANT:  No.  No.  It wasn't going on once I got

2     there, but once I was there, it broke out then.

3          THE COURT:  All right.  You say once you were there it

4     broke out.  So this is the down side of speaking, because then

5     I get to ask you questions.  You say once you were there it

6     broke out.  And I don't mean to revert to trial lawyer mode,

7     but I do have some questions.

8        When you say it broke out, you were part of it, weren't

9     you?  I see video of you yelling and exhorting people to hold

10    the line --

11         THE DEFENDANT:  Yeah, that was after the chaos had

12    broke out.  That was after the chaos --

13         THE COURT:  So are you saying you were just standing

14    there and the chaos broke out?

15         THE DEFENDANT:  No.  No.  No.  What I'm trying to say

16    is that once the chaos had broke out, I got caught up in it

17    also because of the tensions and the feelings from that day

18    and everything that had led up to it.  I got caught up in it.

19      Now, I'm not saying that I'm completely innocent, because

20    I'm not, by no means.  I am sorry.  And I expressed that

21    during the interview with the agents, that I am extremely

22    sorry for what happened to this officer and all the other

23    officers who were there that day.

24         THE COURT:  When you say you got caught up -- and I

25    hear that a lot.  When you say you got caught up, Mr. Ponder,

1    there's a lot of rage and a lot of emotion and a lot of

2    tension as you describe, and people felt very strongly, right

3    or wrongly, that an election had been stolen.  I think the

4    evidence is quite clear that it had not, but that's neither

5    here nor there.  Because you're not being prosecuted or

6    pleading guilty for your political beliefs.

7        But the tensions are high, the emotions are high, and so

8    are yours.  Right?  Your emotions are high.  You're enraged.

9    You're upset.

10               THE DEFENDANT:  Yes.

11               THE COURT:  Why do you pick up the pole?

12               THE DEFENDANT:  Because I had been pepper-sprayed

13   earlier.  Once I had got pepper-sprayed and then it cleared,

14   then it became a thing of it wasn't like something that I just

15   thought about, you know, like I wasn't thinking that day.

16   It's just I wasn't thinking.  It was like just reaction.

17   Reaction.  That's it.

18               THE COURT:  But then after you take the pole, you hit

19   Officer Gonell's shield with your pole.  The pole shatters,

20   cracks Officer Gonell's shield and it shatters.  And then you

21   go get another pole?  What are you thinking?  What's your

22   intent?

23               THE DEFENDANT:  As I said, Your Honor, I wasn't

24   thinking.  That day I wasn't thinking.  And I'm extremely

25   sorry for that.  I wasn't thinking that day.  You know, I have

1    been in trouble a lot of times in my life due to things that I

2    initiated, I initiated.  This one, I never meant for this to

3    happen.  Never meant for it to happen.

4        Your Honor, in the past 12 years I haven't even had one

5    stop by the police at all for anything.  For anything,

6    Your Honor.  And, you know -- Your Honor, I'm not saying that

7    I'm completely innocent of this.  I'm not.  But I am a

8    changed -- I have been a changed person for the last 12 years.

9    I have been.

10       And today I'm not asking for justice because if you gave me

11   justice, Your Honor, I deserve everything that I get.  I'm

12   asking for mercy.  I'm asking for leniency.  I'm asking for

13   mercy.

14           THE COURT:  Thank you, Mr. Ponder.  I appreciate that.

15       All right.  After calculating the sentencing guidelines and

16   departures and hearing from both counsel and Mr. Ponder and

17   Sergeant Gonell, I have to, as I must in every case, consider

18   the relevant factors set out by Congress in 18 U.S.C.

19   § 3553(a), and ensure that I impose a sentence sufficient but

20   not greater than necessary to comply with the purposes of

21   sentencing.

22       These purposes include the -- and that is a standard that's

23   quoted in every single criminal case.  And it sounds simple,

24   but it's actually extremely difficult.  And it is -- I say it

25   all the time; this is the hardest part of my job and I think a

1    lot of my colleagues' jobs.

2       The purposes of sentencing include the need for the

3    sentence imposed to reflect the seriousness of the offense, to

4    promote respect for the law, and to provide just punishment

5    for the offense.  The sentence should also deter criminal

6    conduct, protect the public from future crimes by Mr. Ponder,

7    and promote rehabilitation.

8       In addition to the guidelines and policy statements and the

9    purposes of sentencing, I also have to consider the nature and

10   circumstances of the offense, Mr. Ponder's history and

11   characteristics, the types of sentences available, the need to

12   avoid unwarranted sentence disparity among defendants with

13   similar records who have been found guilty of similar conduct,

14   and the need to provide restitution to any victims of the

15   offense.

16      I've considered all of these factors at some length in

17   deciding what the appropriate sentence is in this case, and

18   I'll discuss some of them now.

19      With regard to the nature of the offense, I have said it,

20   my colleagues have said it, it bears repeating in every case,

21   because every defendant before me in these January 6 cases is

22   an individual and deserves to have their case considered

23   separately.

24      The January 6 attack on the U.S. Capitol was unprecedented,

25   violent, and posed an existential threat to our democracy.  It

1    continues to reverberate today.  It has exposed and maybe

2    caused serious cracks in our democratic system.  It terrified

3    a nation who watched that day and continues to reverberate as

4    we've seen more and more evidence from the events of that day.

5        I have watched many, many, many hours probably of this case

6    of videotape and listened to audio and seen photographs from

7    that day, and I continue to be shocked by what I saw.  I

8    watched last night again the video clips involving Mr. Ponder,

9    and they are horrifying.  And I'm watching them on a screen,

10   and I'm holding my breath and I am terrified, and I cannot

11   imagine what Sergeant Gonell and his fellow officers were

12   feeling as they were attacked repeatedly by a mob that was

13   hellbent to kill them to get to where they wanted to go.  And

14   they were outnumbered.  And they were just trying to do their

15   job.

16       I cannot imagine what that was like.  No amount of

17   videotape can convey what that must have been like.  And I

18   think that Sergeant Gonell's words here were very measured

19   considering what he went through that day.

20       More than a hundred law enforcement officers were injured

21   that day, to say nothing of the lasting effects that officers

22   have suffered, including long-term injury, posttraumatic

23   disorder, having to retire from jobs that they loved like

24   Sergeant Gonell, suicide.  We're going to keep -- and that's

25   the officers.  That's not the people who were also inside the

building hiding under their desk, calling their children,

calling their loved ones, not sure if they would make it home,

looking out the windows and seeing gallows being erected and

hearing calls for all kinds of violence to be inflicted on

them for doing their patriotic duty.

People like to talk about Washington and call it a swamp.

But Washington is full of people who come here to serve their

country.  In the case of Sergeant Gonell, he's an immigrant

doing his job, a job he loved.  People who come here, they

could make more money in the private sector.  They come here

because they love their country.  And the people inside that

building that day and the people trying to guard that building

that day did it because they were patriots.  And for them to

be abused and called traitors and be attacked is frankly

outrageous.

Mr. Ponder was a violent participant in that attack.  He,

believing the election to be stolen -- look, I said it before,

and I'll say it again:  I am not punishing Mr. Ponder for his

political beliefs.  I don't believe he's being prosecuted for

his political beliefs.

One of the great things about this country is you can

believe whatever you want to believe, no matter how not

connected to reality it is.  You are free to believe what you

want to believe.  You're free to protest.  You're free to

attend a rally.  You're free to march to the Capitol and

protest.  But what Mr. Ponder is being punished for today is

for being a violent participant in that mob.  I've said it

before: A mob isn't a mob without numbers.  Mr. Ponder didn't

just stand there and, you know, have everything swirling

around him.  He was leading the charge.  He was in there

swinging the pole.  And when his pole broke, he picked up

another pole.  And when he was told to leave by the other

officers, he came back.  At 5:08 he's still on the Capitol

grounds.  That's three hours.

On the West Plaza at approximately 2:28 Mr. Ponder and the

other rioters were engaged in violent assault on Capitol

police officers who were bravely defending the Capitol and the

people inside.  He's shown on video charging at Sergeant

Gonell with a long thin pole, smashing the pole on the officer

who blocked the blow with his shield, which cracked.  The blow

was so forceful that it broke the pole.

Mr. Ponder then retreats into the crowd, where he felt

safe, but only for a moment.  He emerges with, of all things,

a red, white, and blue pole.  As Ms. Bond noted, the irony is

palpable.  I mean -- because there was nothing patriotic about

what Mr. Ponder was doing.  Mr. Ponder had crossed the line

from protesting what he felt was a stolen election to trying

to stop the transfer of power.

And I'll just recall that there was a previous election in

this country where millions of people felt that the election

had been stolen, rightly or wrongly.  There was a Supreme
Court decision that decided that issue, and the citizens of
this country went about their business, accepted the decision,
accepted the new government, and moved on.

Not that day.  Mr. Ponder was part of a group of people
that felt like if they couldn't get what they wanted, they
were going to take it and they were going to take it through
violence.

Fifteen minutes later Mr. Ponder is on the Upper West
Terrace assaulting a third officer with that red, white, and
blue pole, swinging it.  And if you look at the videos, he
wasn't defending himself or anybody else.  He was trying to
injure those officers.  And we are lucky that Officer Gonell
or somebody like him was not killed that day with the force
that Mr. Ponder was swinging those poles.

Officers were able to wrestle him to the ground and detain
him, and while they're walking him off the premises with his
arms behind his back, he's shouting to the other violent
protesters, hold the line, against the police officers.
That's not caught up.  That's not caught up.  That's
encouraging.  That's leading.  "Hold the line," while officers
like Sergeant Gonell are fighting for their lives and to
protect the people inside.

When there wasn't going to be a transport vehicle to take
Mr. Ponder, the officers told him to leave the premises.  They

1    got his information, they said leave the Capitol grounds.  He

2    ignored them.  He returns to the Capitol and starts reengaging

3    in fighting with the police officers.  And at approximately

4    4:07 p.m. he can be seen on video surveillance at the mouth of

5    the Lower West Terrace tunnel armed with a riot shield.

6        He appears to be using this shield to either block the

7    police as they fought back against the crowd or to push the

8    police.  That's three times he's engaging with weapons -- or

9    with objects against the police, including a third time after

10   he had been told to leave the grounds.  This is not caught up,

11   Mr. Ponder.  This is not caught up.

12       There are numerous moments when Mr. Ponder could have

13   stopped what he was doing and said okay, you know what, this

14   is crazy.  I lost my head.  He could have stopped after the

15   pole broke, after he cracked Officer Gonell's shield.  He

16   could have stopped after police told him to leave the

17   premises, when he realized he could be prosecuted.  But there

18   was no transport vehicle.  Each time, he comes back.  He was

19   intent on attacking and injuring police officers.  This was

20   not a protest.

21       And as long as he had the safety of numbers around him, he

22   kept doing it.  This was not bravery.  This was not

23   patriotism.  The people who were brave, the people who were

24   patriots that night were the officers and the employees inside

25   the Capitol who were risking their lives.

1       Turning to Mr. Ponder's characteristics as an offender, the

2      Court has to consider the fact that Mr. Conte said -- and

3      Mr. Conte's been doing this work for a long time.  And I have

4      been in the criminal justice system for a long time, and I

5      agree with Mr. Conte.  Mr. Ponder has had a horrific

6      upbringing.  There's no way to sugarcoat that.  Unfortunately,

7      I see people coming before me all the time who had terrible,

8      terrible childhoods, and it's no wonder that they continue to

9      suffer the effects of those childhoods and continue to engage

10     in often antisocial behavior.

11       And I think, frankly, that's where we are here.  Mr. Ponder

12     is able to function, but he is still carrying the scars and

13     the trauma from -- from that childhood, and it seems like he

14     may have buried it, but he is still suffering the effects of a

15     very chaotic, violent, and dysfunctional upbringing.  And I

16     factor that into consideration when I'm thinking of what

17     sentence to give him.

18       He didn't -- it's not accidental, I think, or unexpected

19     that Mr. Ponder became violent that day, because that's how --

20     children who are treated with violence often respond with

21     violence when they get older.  And it is tragic and frankly an

22     indictment of our child welfare system that Mr. Ponder was not

23     helped by the system, that he had to grow up in those

24     circumstances.

25       So I'm not -- I am mindful of his circumstances, and I am

1  taking them into consideration.  But the fact is he's here

2  now.  And one of the things I do have to do is protect society

3  from any further acts of violence by the defendant, and I'm

4  not convinced that Mr. Ponder has dealt with or has somehow

5  been able to resolve his past in such a fashion that he

6  wouldn't pose a threat to the community in the future.  That's

7  one of the things I have to consider.

8      You can only -- I mean, with incarceration, you know, you

9  can only lock somebody up for so long.  They're going to be

10  back on the streets one day and you have to consider how the

11  sentence will aid the defendant in living a productive life.

12  And I'm hoping whatever sentence I give Mr. Ponder, he will be

13  able to get assistance, he will be able to get mental health

14  treatment, he will be able to get counseling and he will be

15  able to live the rest of his life without getting into trouble

16  with law enforcement.

17      I also have to consider Mr. Ponder's prior criminal

18  history.  And it's true he only has one -- well, it's actually

19  two.  It was a bank robbery and a robbery about a week apart

20  that get criminal history points, but he had significant

21  criminal history before.  I'm not penalizing him for those

22  charges for which he didn't get points, but I am taking them

23  into consideration, which is that he has a criminal history.

24  It is true he went 12 years since his last violent

25  convictions.  But if you look at the facts of those

1   convictions, they're troubling.  Especially the robbery.  The

2   bank robbery, yes, but the armed robbery even more so because

3   there's actual violence involved.

4       At the time of his arrest he was unemployed.  He has had

5   spotty but some employment.  He's not unable to work.

6       And the other thing I have to consider are the types of

7   sentences available.  Obviously, there's a request for

8   incarceration here, but the range I'm looking at here is 57 to

9   71 months of imprisonment.  And the government allocutes for

10  60 months in keeping with their bargain and their agreement in

11  the plea agreement to allocute for the bottom quarter of the

12  applicable range.

13      He faces a supervised release range of no more than three

14  years.  Probation is not a consideration here that I'm going

15  to give in this case.  And the statute sets a maximum fine of

16  $250,000.  He's agreed to pay restitution in the amount of

17  $2,000.  And he's agreed to pay a mandatory fine to the

18  district court of $100.

19      So one of the last factors I'm going to discuss here is the

20  need to avoid unwarranted sentence disparity.  And these cases

21  are unique and often there are not appropriate comparators in

22  deciding what is an appropriate sentence.  Everybody has a

23  different history, everybody took different actions, and the

24  defendants sometimes took different actions afterwards.  Some

25  people destroyed evidence, some people didn't.  I take all

1   those things into consideration.

2    In this case I do think that an appropriate comparator here

3   is the Palmer case, which I had, in which I imposed 63 months

4   on Mr. Palmer, who was actually I believe older than

5   Mr. Ponder, who had a previous criminal conviction and who

6   threw a fire extinguisher at police officers and then later

7   tried to assault them with a pole at the Capitol.

8    I don't recall seeing any videotape of him actually

9   damaging or making contact with the officers, but he was

10   certainly exhorting the crowd and encouraging them.  And I

11   gave Mr. Palmer in that case 63 months, which was at the top

12   of the guidelines range.

13    With regard to the defense request for a variance, I have

14   been known to vary down frequently.  But this is not a case

15   that warrants a variance.  Not at all.  Not even close.

16   Mr. Ponder's actions, his criminal history, his repeated

17   actions, his repeated acts of violence that day do not warrant

18   a variance in this case.

19    And, frankly, I'll also point out *United States v. Wilson*

20   in which Judge Lamberth imposed a 51-month sentence of

21   incarceration for punching, kicking, shoving and kicking

22   officers guarding an entrance to the Capitol.

23    Mr. Ponder has no doubt had -- he had a terrible

24   upbringing, and that horrific violence and disruptive

25   upbringing no doubt contributed to why he acted that way that

1    day.  But Mr. Ponder had lived 12 years since his past

2    conviction, 12 years without another criminal arrest, 12 years

3    without getting into trouble with the law.  So it can't all be

4    his childhood.  He didn't get what he wanted.  And because he

5    didn't, he felt entitled to attack law enforcement officers

6    who were simply doing their job.

7        I don't know that I've ever varied up in a criminal case.

8    I may have.  I don't think I have.  But I have to tell you, I

9    seriously considered doing that in this case, so appalled was

10   I at the acts of violence that I saw on those video clips, so

11   moved have I been by Sergeant Gonell's statements.  But I'm

12   not going to.  I believe the plea offer the government entered

13   into with Mr. Conte is a fair one, it's an appropriate one,

14   and I believe the sentencing guideline range in this case

15   gives me enough leeway and my sentence is going to stay within

16   the guidelines.

17       However, based on my consideration of all the § 3553(a)

18   factors, I believe that given Mr. Ponder's actions in this

19   case, a sentence of above what the government is asking for in

20   this case is warranted.  Therefore, I will now state my

21   sentence on the record.  Can you stand, Mr. Ponder.

22       (Defendant complies.)

23       It is the judgment of the Court that you, Mark K. Ponder,

24   are hereby committed to the custody of the Bureau of Prisons

25   for a term of 63 months of imprisonment for assaulting,

1    resisting or impeding certain officers using a dangerous

2    weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).  You

3    are further sentenced to serve 36 months, that is three years,

4    of supervised release.  You must pay a $100 special assessment

5    and you must pay $2,000 in restitution.  The special

6    assessment is immediately payable to the Clerk of the Court

7    for the U.S. District Court of the District of Columbia who

8    shall forward the payments to the Architect of the Capitol.

9        Within 30 days of any change of address you shall notify

10   the Clerk of the Court of the change until such time as the

11   financial obligation is paid in full.

12       Within 72 hours of release from custody, you shall report

13   in person to the probation office in the district where you're

14   released.  While on supervision you shall abide by the

15   following mandatory conditions as well as the standard

16   conditions of supervision which are imposed to establish the

17   basic expectations for your conduct while on supervision.

18       The mandatory conditions include you must not commit

19   another federal, state, or local crime, you must not

20   unlawfully possess a controlled substance, you must refrain

21   from any unlawful use of a controlled substance, and you must

22   submit to one drug test within 15 days of placement on

23   supervision and at least two periodic drug tests thereafter as

24   determined by the Court.

25       You must cooperate in the collection of DNA as directed by

1    the probation officer, and you must make restitution in

2    accordance with 18 U.S.C. § 3663 and 3663a and any other

3    statute authorizing a sentence of restitution, which is $2,000

4    in this case.

5        You must also abide by the following special conditions:

6    You must participate in a mental health treatment program and

7    follow the rules and regulations of that program.  The

8    probation officer, in consultation with the treatment

9    provider, will supervise your participation.  I believe that

10   this is vitally necessary for you, Mr. Ponder, because one of

11   the things I think you struggle with is, given your childhood

12   and given your background, responding appropriately to

13   stressors.

14       You must participate in a vocational services program and

15   follow the rules and regulations of that program.  Such a

16   program may include job readiness training and skills

17   development training.

18       The Court finds that you do not have the ability to pay a

19   fine and therefore waives imposition of a fine in this case.

20       The probation office shall release the presentence

21   investigation report to all appropriate agencies in order to

22   execute the sentence of the Court.

23       Mr. Conte, do you have a request for a recommendation for a

24   facility?

25           MR. CONTE:  Your Honor, just as close as possible to

1   the Washington, D.C., area.

2          THE COURT:  All right.  I will recommend -- Mr. Ponder,

3   I have no authority over the Bureau of Prisons.  Trust me.

4   But I can make a recommendation to them, and I will make a

5   recommendation that you be housed in a facility as close as

6   possible to the Washington, D.C., metropolitan area.

7       Pursuant to 18 U.S.C. § 3742, you have a right to appeal

8   the sentence imposed by this court, subject to certain rights

9   of appeal that you waived as part of your plea agreement in

10  this case.  If you choose to appeal you must file an appeal

11  within 14 days after the Court enters judgment.  If you are

12  unable to afford the cost of an appeal, you may request

13  permission from the Court to file an appeal without cost to

14  you.

15      Are there any objections to this sentence not already on

16  the record, Ms. Bond?

17          MS. BOND:  No, Your Honor.

18          THE COURT:  Mr. Conte?

19          MR. CONTE:  No, Your Honor.

20          THE COURT:  Mr. Ponder, I say it often and I'll say it

21  again here, which is you're not the worst thing you've ever

22  done.  You are much more than that.  You have an opportunity

23  to learn something from this, to reflect on this, perhaps to

24  gain information from a variety of sources so that you are not

25  caught up in something like this again.

1          As I've told you, your political beliefs are your own, and

2     you have a right to them, but in this case, they led you to be

3     with people who were violent extremists and to act in a

4     fashion that has now resulted in your having an incarceratory

5     sentence.

6          I wish you good luck, sir.  And we're adjourned.

7          (Proceedings adjourned at 12:39 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne